UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| DEANNA DUNCAN, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | 1:09-cv-0183-SEB-TAB |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**Entry Discussing Complaint for Judicial Review**

Deanna Duncan ("Duncan"), *pro se,* seeks judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. § 301, *et seq.*

For the reasons explained in this Entry, the Commissioner's decision must be **remanded to consider new evidence.**

**I.  Background**

Duncan filed applications for DIB and SSI on June 6, 2005, and June 16, 2005, respectively, alleging an onset date of disability of February 1, 2005. Her applications were denied initially and upon reconsideration. Her request for a hearing before an Administrative Law Judge ("ALJ") was granted and a video hearing was conducted on March 13, 2008. Duncan appeared, accompanied by her attorney. Medical and other records were introduced into evidence. Duncan and a vocational expert testified at the hearing.[1] The ALJ issued a decision denying benefits on June 27, 2008. On December 24, 2008, the Appeals Council denied Duncan's request for review, making the ALJ's decision final. *See Getch v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2008). This action for judicial review of the ALJ's decision followed. The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g), which provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . in [a] district court of the United States."

---

[1]The ALJ recited in his decision that a friend of Duncan's, Linda Falkenstein, also testified at the hearing. (R. at 27). The transcript of the hearing does not bear this out. (R. at 306-07). Moreover, the written statement of Ms. Falkenstein indicates that she took Duncan to the hearing but she was not given an opportunity to testify.

The ALJ's decision included the following findings: (1) Duncan met the insured status requirements of the Act through December 31, 2010; (2) Duncan had not engaged in substantial gainful activity since February 1, 2005, the alleged onset date; (3) Duncan had severe impairments consisting of back and knee pain, tendonitis in the hips, major depressive disorder, and anxiety disorder; (4) Duncan did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Duncan had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except that she should be allowed to sit or stand at will and she was capable of performing only unskilled work; and (6) Duncan was capable of performing past relevant work as a cashier as such work did not require the performance of work-related activities precluded by her RFC. With these findings in hand, and through the application of applicable rules and regulations, the ALJ concluded that Duncan had not been under a disability as defined in the Act from February 1, 2005, through the date of the ALJ's decision.

## II. Discussion

### A. Applicable Law

To be eligible for DIB and SSI, a claimant must prove she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). To establish disability, the plaintiff is required to present medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. §§ 416.908; 404.1508.

A five-step inquiry outlined in Social Security regulations is used to determine disability status. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005).

> The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520, 416.920. A finding of disability requires an affirmative answer at either step three or step five.

*Id.* The claimant bears the burden of proof at steps one through four, and at step five the burden shifts to the Commissioner. *Id.* at 352.

The task a court faces in a case such as this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision was supported by substantial evidence and otherwise is free of legal error. *Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir. 1993).  "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB,* 305 U.S. 197, 229 (1938)).

**B.    Analysis**

Duncan was over 60 years old at the time the ALJ issued his decision. The ALJ determined that Duncan had severe impairments consisting of back and knee pain, tendonitis in the hips, major depressive disorder, and anxiety disorder, but that Duncan could perform some of her past relevant work. Duncan, proceeding *pro se*, requests that the court consider additional evidence that she has presented to the District Court. The Commissioner has responded to Duncan's request, and has also asserted his defense to the arguments that Duncan's former counsel presented to the Appeals Council.

The court first considers the issues presented by the submission of additional evidence. A reviewing court may order that a case be remanded to the Commissioner to consider additional evidence upon a showing "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). This is known as a "sentence six remand."

The hearing in this case was held on March 13, 2008. The ALJ issued his decision on June 27, 2008. Duncan has tendered the following additional evidence:

1) an undated Multiple Impairment Questionnaire completed by Dr. Midla sometime on or after November 3, 2008 ("most recent exam");
2) a Patient Instruction sheet from St. Francis emergency room dated August 5, 2008;
3) 3 records dated July 2, August 7, and November 3, 2008, from visits to Kendrick Family Practice, reporting tremors, shakes and bowel problems;
4) a letter from treating physician Dr. Midla dated February 23, 2009;
5) records indicating that an esophagram test was conducted in March 2009;
6) insurance documents that reflect the approval of a brain MRI in March 2009;
7) a Report of Psychological Consultations dated March 23, 2009, from clinical psychologist Dr. Mark Roth;
8) Community Hospital records dated May 27, 2009, showing that a thyroid uptake and scan was conducted indicating a diagnosis of hyperthyroidism and suggesting Graves' Disease;
9) a letter dated June 7, 2009, from new primary care physician Dr. Dellinger;
10) a letter dated June 7, 2009, from Clinical Counselor Peter Wiethe, MA, LMHC;
11) a statement written by friend and former co-worker Stephen Huffman; and
12) a letter written by friend Linda Falkenstein dated June 8, 2009.

To satisfy the elements of a sentence six remand, the tendered evidence must be new and material and there must be good cause for the claimant's failure to present it to the ALJ. *Richmond v. Chater*, 94 F.3d 263, 268 (7th Cir.1996) (a court may order such a remand when a claimant presents new, material evidence which, for good cause, he could not have presented earlier). "New" evidence did not exist or was unavailable to the claimant at the time of the hearing. *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005). "To be material, the evidence must 'relate to the claimant's condition during the relevant time period encompassed by the disability application under review.'" *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999) (quoting *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989)). In addition, such evidence is "material" if there is a reasonable probability that it would have changed the outcome of the claimant's hearing. *Schmidt,* 395 F.3d at 742.

*Is the tendered evidence "new?"*

None of the tendered evidence existed at the time of the hearing. The Commissioner, however, argues that the updated opinions from treating physician Dr. Midla were not "new" because they were merely "derivative," meaning that his conclusions in the tendered records were based entirely on evidence that had long been available. *See Simila v. Astrue*, 573 F.3d 503, 522 (7th Cir. 2009) (report from physician was "derivative evidence" where no new tests or examinations were conducted and the report was an elaboration on earlier reports and a response to attorney's questions about the ALJ's concerns); *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (evaluations based entirely on evidence that had long been available were derivative and not new). The Commissioner does not assert that any of the other tendered evidence was not new.

The undated Multiple Impairment Questionnaire was completed by Dr. Midla at some point on or after November 3, 2008, the date he "last" examined Duncan. It provides more specific opinions as to Duncan's ability to sit (4 hours), stand/walk (less than 1 hour), and that she experienced "frequent" symptoms that interfered with attention and concentration. In the letter from Dr. Midla dated February 23, 2009, Dr. Midla reported Duncan's diagnoses and medications. He further reported that since 2004, Duncan did not eat, sleep or function well, she had lost almost 40 pounds, she could tolerate no stress, her tremors had worsened, she had developed a problem with incontinence, and her knees persistently gave out on her. He stated that diagnostic tests and appropriate treatment, including regular medications, had been lacking because Duncan did not have insurance. He opined that Duncan was in no condition to be employed and that she needed psychiatric care, medications, orthopedic evaluation and treatment for her back and knees and neurological treatment for her tremors.

These assessments indicate that Dr. Midla examined Duncan in November 2008, which was after the ALJ's decision was issued. Some of these opinions, however, are already part of the record and as such are derivative in nature, or simply not new. The ALJ discredited Duncan's mental health complaints by concluding that "[a]t the very least, since she was prescribed antidepressants and anti-anxiety medications by her treating physician, it seems likely that a greater attempt would have been made to get the claimant into psychiatric care, or at least adjust her medications so that she could be more functional." (R. at 34). This conclusion ignores Dr. Midla's remarks in the March 2008 report (of record)

that "although in need of psychiatric care - - she cannot afford this," (R. at 295), and "[m]edications help some, but she needs expert advice and care from psychology, psychiatry." (R. at 296). Dr. Midla repeats his assessment that Duncan could not afford adequate mental health treatment in the newly tendered evidence. Dr. Midla added a notation that Duncan only took her medications when she could pay for them or when she obtained samples. Although Dr. Midla conducted "new" examinations of Duncan since the hearing, and although the tendered reports contain more specific restrictions on Duncan's abilities to function, it is not possible to determine whether such restrictions arose out of the more recent examinations. The Commissioner's contention that the bulk of the post-decision evaluations from Dr. Midla were not "new" is well taken. A significant portion of the newly presented evidence, however, is "new." Accordingly, the court shall consider the remaining issues for a sentence six remand.

*Was there good cause for the failure to present the tendered evidence earlier?*

The Commissioner argues that Duncan has failed to show good cause for her failure to present the new evidence to the ALJ. The court disagrees. Duncan asserts that she did not have insurance during the time her conditions were considered by the ALJ. She reports that she has since obtained insurance coverage through a program of the State of Indiana, "Healthy Indiana Plan." She states that since she has had the insurance, she has been able to see more physicians and obtain additional testing. The ALJ acknowledged that Duncan had "neither received nor sought medical treatment consistent with symptoms and limitations which would preclude all employment, although it should be noted that she alleges that this is due to limited finances." (R. at 32). Duncan has consistently asserted that her lack of finances limited her ability to seek treatment, pay for medications, and obtain further testing. During the hearing, the ALJ, Duncan and her counsel discussed at length the fact that Duncan's lack of money had limited the number of times she went to the doctor and also had created difficulties in obtaining copies of her medical records. She now contends that since she has obtained insurance coverage, she has been able to access additional medical resources.

"The good cause requirement is indicative of congressional intent to prevent bad faith manipulation of the administrative process." *Bush v. Astrue*, 571 F.Supp.2d. 866, 876 (N.D.Ill. 2008) (internal quotation omitted). There is no evidence of manipulation of the process by Duncan. Rather, as reflected in several places in the record, her financial situation limited her access to treatment and testing prior to the hearing. *See Ferguson v. Astrue*, 541 F.Supp.2d 1036,1051 (E.D. Wis. 2008) (finding good cause where claimant was unable to afford the medical tests until after the hearing). Under these circumstances, "[t]his record and these facts convince us that this is not a case of 'sandbagging' by a claimant who loses and hopes to get another chance at obtaining benefits by bringing in new evidence." *Sears v. Bowen*, 840 F.2d 394, 400 (7th Cir. 1988). With the exception of the two written statements from friends, for which no explanation has been provided as to why they could not have been presented earlier, Duncan has shown good cause for not having and presenting the new evidence during the administrative proceedings.

*Is the tendered evidence "material?"*

The final consideration is whether the new evidence is material. The court finds that the evidence is material in the sense that it relates to Duncan's conditions during the relevant time period. The more difficult question is whether there is a reasonable probability that it would have changed the ALJ's decision. The Commissioner asserts in conclusory fashion that there is not a reasonable probability that the ALJ would have reached a different conclusion. Further analysis is warranted.

Several of the documents tendered by Duncan would not change the ALJ's decision because they do not contain substantive information and/or provide an indication of Duncan's limitations. The documents that fit that description include the Patient Instruction Sheet from St. Francis emergency room, the notation that an esophagram test was conducted, insurance documents that reflect the approval of a brain MRI, and hospital records relating to a thyroid uptake and scan indicating a diagnosis of hyperthyroidism and Grave's Disease. Moreover, the letter from Duncan's new primary care physician of four months, Dr. Dellinger, lists Duncan's mental health disorders and symptoms and makes a recommendation that she undergo a full psychiatric evaluation. Dr. Dellinger confirms Duncan's reports, but he does not offer an opinion that could reasonably change the ALJ's mind as to Duncan's ability to perform work activities.

A few of the tendered records have not yet been discussed, including the Report of Psychological Consultations dated March 23, 2009, from clinical psychologist Dr. Mark Roth. In his decision, the ALJ rejected in large part Duncan's complaints of mental impairments. The ALJ did not give much weight to Dr. Midla's opinions concerning Duncan's significant depression, anxiety and panic attacks because the ultimate determination of "disabled" is reserved to the Commissioner, Duncan did not attempt to obtain more psychiatric care, and mental health was not Dr. Midla's area of expertise. (R. at 34). Mental health is Dr. Roth's area of expertise. Dr. Roth reported that he had seen Duncan three times in February 2009 for an initial evaluation and subsequent psychotherapy for her mental problems. He diagnosed Major Depressive Episode-Recurrent, Posttraumatic Stress Disorder, and Panic Disorder with Agoraphobia. He indicated that Duncan had chronic symptoms of anxiety and depression including withdrawal, insomnia, appetite disruption and significant weight loss, impaired concentration and forgetfulness, emotional lability, loss of energy and motivation, and chronic agitation. He also noted her reports of incontinence, in part anxiety-related. She continued on Xanax and Lexapro. Dr. Roth reported his impressions that Duncan had a high level of agitation, problems concentrating for periods of time, labile and depressed affect and thought content, low stress tolerance and an observable tremor. He opined that she could not perform any work and he recommended that she continue treatment with psychotropic medication and psychotherapy. The court finds that this report from a treating psychologist is material for purposes of a sentence six remand.

Another report was tendered by Duncan's licensed mental health counselor, Peter Wiethe, MA, LMHC, who saw Duncan for an intake assessment in April 2009. In Mr. Weithe's report, he assessed a Global Assessment of Functioning ("GAF") of 40 (impairment in reality testing or communication or a major impairment in several areas).

A GAF score of one point *higher* than Duncan's, 41, would indicate "serious" symptoms. Weithe recommended partial hospitalization as the appropriate frequency and level of care, although Duncan indicated that she would not be able to pay for that type of treatment. Both Wiethe and Dr. Roth report that Duncan experienced traumas in an abusive marriage, the sudden death of her mother, watching her boyfriend die and then watching her co-driver of a semi-truck die in the driver's seat while she had to stop the truck that was out of control. She was reportedly fearful of leaving her house and experienced severe anxiety and panic attacks. Wiethe opined that due to her severe trauma it was unlikely that she would be able to focus, stop flashbacks and reliving the traumas enough to maintain employment. The statement from her former co-driver Stephen Huffman confirmed that because she would pass out and have panic attacks, it was not safe to drive with her beginning in 2005.

The record accumulated during the administrative proceedings certainly supported at least moderate symptoms of mental health conditions, but input from mental health sources was lacking. The additional records confirm that history and also provide more specific information as to how such conditions have impaired Duncan's ability to function on a daily basis. Serious symptoms of incontinence, weight loss, impaired concentration, forgetfulness, and chronic agitation are not reported as new, but have been chronic, and are now supported by the evaluations of mental health practitioners. The three records from 2008 from the Kendrick Family Practice confirm that Duncan sought treatment for tremors, shakes and bowel problems. The symptom of anxiety-related incontinence should be considered in terms of how it would affect Duncan's ability to function on a day to day basis in a work setting. The supplements to the mental health records could also reasonably change the ALJ's view of Duncan's credibility, which he discounted in some respects due to lack of treatment and to the extent she alleged she would have difficulty performing even unskilled work on a consistent basis. (R. at 32). The court finds that there is a reasonable probability that had the "new" evaluations, opinions and other records been part of the record when the ALJ issued his decision, the outcome would have been different.

*Restrictions based on mental impairments*

For the sake of clarity on remand, the court will address one other issue. The Commissioner argues that the ALJ's decision does not violate the concerns articulated in *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009). In *Stewart*, the court affirmed its earlier holdings that an ALJ may not properly account for mental impairments in memory and concentration by merely restricting a claimant's RFC to "simple tasks." *Id.* at 685. ("The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple tasks', and we and our sister courts continue to reject the Commissioner's position."). Here, the ALJ determined that Duncan was moderately limited with regard to concentration, persistence or pace. (R. at 30). The ALJ stated that Duncan's deficits in concentration "have been taken into account in the claimant's above described residual functional capacity," (R. at 34), apparently by limiting her to unskilled work.

7

The Commissioner argues that the ALJ did not find that Duncan was moderately limited in concentration, persistence or pace and then merely limit her to unskilled tasks. The Commissioner contends that the ALJ explained why that limitation to unskilled work was appropriate by stating as follows:

> Overall, the claimant's allegations are consistent with the ability to perform unskilled work. Though she does experience some low energy and reduced concentration due [sic] anxiety and depression, she can complete household tasks and interact with others when she chooses to push herself. The claimant's lack of energy has also been taken into consideration in finding her limited to sedentary work. Regarding reduced memory, concentration and energy, the claimant is found credible to the extent that she would reasonably be precluded from performing more than unskilled work.

(R. at 32).

The court is not persuaded to the Commissioners' position. The ALJ appears to give with one hand and take away with the other. In other words, while he acknowledged a moderate limitation in memory and concentration, he also found Duncan only credible to the extent that she would be precluded from performing more than unskilled work. It appears that the ALJ concluded on the basis of other factors that Duncan could perform unskilled work, and then simply found her credible to that extent. The ALJ failed to analyze how her impairment in concentration and memory would permit her to perform any work on a sustained basis, whether unskilled or skilled. The ALJ's "accommodation" of Duncan's mental impairments is not supported by substantial evidence. In addition, because the ALJ based his rationale on Duncan's ability to complete household tasks, on remand he shall grapple with evidence indicating that Duncan had difficulty completing household chores in a timely manner. In light of the fact that the new evidence could reasonably support a finding of a greater deficit in concentration and memory and other symptoms of mental impairments, the issue of compliance with *Stewart* may become moot after remand.

### III. Conclusion

The court finds that some of the new evidence presented satisfies all of the requirements of a remand pursuant to sentence six because it is new, material and there was good cause for not having presented it to the ALJ. Any additional evidence, including that which has not satisfied each of the sentence six requirements, may be presented on remand. This matter is remanded pursuant to sentence six of 42. U.S.C. § 405(g) for consideration of additional evidence. The court retains jurisdiction over the case, and therefore, no final judgment will be entered at this time.

**IT IS SO ORDERED.**

Date: 03/12/2010

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Deanna Duncan
3956 Hoyt Ave.
Indianapolis, IN 46203